IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 11, 2022 Session

**STATE OF TENNESSEE v. MARCUS ROSHONE PERRY**

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-193      Steve R. Dozier, Judge**
_____

**No. M2020-01407-CCA-R3-CD**
_____

Marcus Roshone Perry, Defendant, appeals his convictions for two counts of premeditated first degree murder, one count of first degree felony murder, and one count of felon in possession of a firearm, claiming that the trial court erred (1) in admitting hearsay evidence, (2) in admitting discoverable evidence that was not provided to Defendant, and (3) by empaneling a jury which was not representative of Defendant's peers. Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Erin D. Coleman (on appeal), and Alexa Spata (at trial), Nashville, Tennessee, for the appellant, Marcus Roshone Perry.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Davidson County Grand Jury indicted Defendant for two counts of first degree premeditated murder, one count of first degree felony murder, and one count of felon in

possession of a firearm arising from the deaths of John Morrow and Abdinasir Jimale at Kilimanjaro Sports Bar on September 25, 2016.

At the trial, Lekeisha Morrow testified that she went to Kilimanjaro Sports Bar around 2:30 a.m. to celebrate the twenty-first birthday of her brother, John Morrow. She observed Defendant and her brother having a verbal altercation. A short time later, Ms. Morrow saw Defendant stand up and then heard "four or five gun shots." She said that her brother was talking to Abdinasir Jimale when he and Mr. Jimale were shot. After the shooting, she saw Defendant holding a small black handgun. She called 911, and after the police and paramedics arrived, the victims were taken by ambulance to the hospital. Mr. Morrow died a short time later, and Mr. Jimale survived for two weeks before succumbing to his injuries. After leaving the hospital, Ms. Morrow went to the police station where she selected Defendant from a photographic lineup. On cross-examination, Ms. Morrow agreed that customers were searched for weapons before they were allowed to enter Kilimanjaro Sports Bar.

David Martin, who was working security inside Kilimanjaro Sports Bar at the time of the shooting, testified that Defendant and Mr. Morrow were in an argument and that he stepped in and separated them and that Defendant then left and went outside but returned a short time later. Mr. Martin knew Defendant but did not know Mr. Morrow. Mr. Martin heard gunshots shortly after Defendant reentered the bar. After refreshing Mr. Martin's memory with his preliminary hearing testimony, Mr. Martin agreed that he saw Defendant fire several shots from a black .45 caliber pistol.

Alinchile Ezoua testified that she and a friend were at Kilimanjaro Sports Bar on the night of the shooting and that she met Defendant for the first time that night. She did not know Mr. Morrow or Mr. Jimale. She said that she saw Defendant arguing with another person on the dance floor. She said that, after the two men left the dance floor, they continued to argue near the table where her friend was seated. As she walked toward the table, she heard gunshots and then saw Defendant walk toward the door holding a handgun. She saw two bodies lying on the floor.

Metropolitan Nashville Police Department (MNPD) Officer Charles Duke was the first officer at the scene. Paramedics arrived and were already attending to the victims when MNPD Officer Michael Wolterbeek arrived. Officer Wolterbeek located four .45 caliber spent casings near the door. MNPD Sergeant Michael Mendenhall arrived next. He spoke with Ms. Morrow who stated that she saw Defendant and Mr. Morrow arguing and saw Defendant shoot Mr. Morrow. MNPD Officers Mark Rosenfeld, Danielle Connor, and Caleb Foster were tasked with collecting evidence at the scene. As Officer Connor

photographed the scene, Officer Rosenfeld collected the cartridge casings, a projectile, a hat, and some cups.

MNPD Detective Raymond Heymann was dispatched to Vanderbilt Hospital to determine the extent of the injuries to the two victims. He spoke with Ms. Morrow after she arrived at the hospital. Ms. Morrow stated that her brother was in an argument with a man in Kilimanjaro Sports Bar and that the other man "pulled out a black semiautomatic handgun and shot her brother and also shot Mr. Jimale."

Detective Melody Saxton was able to obtain security camera footage from the day of the shooting from the Kilimanjaro Sports Bar ("the video"). Based on the video, she determined that the shooting happened at 5:15 a.m. on September 25. Detective Saxton testified that "[e]veryone gave the same description for male black, long dreads, heavy-set individual, husky, tall." Detective Saxton extracted still photographs from the video. She said one photograph showed the front of Defendant's face, long dreadlocks, a tattoo on his right arm, and what appeared to be the butt of a handgun in his right hand. She released this photograph to Nashville television news stations which used the photograph on the evening news on September 25, 2016.

Detective Saxton said that she received information that Defendant was staying at a residence in Springfield. A SWAT team went to the location and found Defendant in bed. Officers recovered a bag from the nightstand next to the bed that contained both .45 and .44 caliber bullets. Detective Saxton testified that the Winchester .45 caliber bullets found on the nightstand matched the casing found at the scene of the murder. She said that Defendant was six feet, one inch tall and weighed approximately 270 pounds and that he had "shaved his dreads off" by the time of his arrest. She also said that the tattoo on Defendant's arm appeared to be consistent with the tattoo shown on the still photograph taken from the video. Detective Saxton said that Mr. Martin, Ms. Ezoua, Ms. Morrow, and another witness, Jasmine Prim, each independently selected Defendant from photographic lineups.

MNPD Detective Chad Gish was qualified as an expert in the field of digital forensic analysis. He worked in the surveillance and investigative support unit (SISU) of the department and was the senior investigator in digital forensics. He said that approximately eighty percent of his duties involved analysis of "digital data, such as computers, laptops, cell phones, DVRs, [and] thumb drives." He said that he received an evidence bag containing Defendant's Samsung Galaxy model SM900-V cell phone (the Verizon cell phone) and Samsung Galaxy model SM900-T cell phone (the T-Mobile cell phone) for extraction and analysis.

Detective Gish connected each phone to a Cellebrite forensic software platform to extract images, emails, and text messages. Relevant evidence was extracted from the T-Mobile cell phone. Detective Gish said that the Bluetooth name associated with the T-Mobile cell phone was "Roshone Perry," that the password was "Roshone 37," and that the email account was "marcus.perry36@gmail.com." Once the data was extracted, Detective Gish used Cellebrite software to "parse that data." He said that data is saved to millions of squares, each usually containing 512 characters. He explained that, when a person deletes data, it "is not deleted as in gone and erased" and that the data is "still sitting in the same squares" and it "remains there until the operating system of the computer or the phone decides to use those squares to save new data." After a square is overwritten with new data, the previous data is no longer recoverable. Out of the 1,910 call logs Detective Gish recovered from the T-Mobile cell phone, 1,075 had been deleted.

When the State attempted to question Detective Gish about the text messages he extracted from Defendant's T-Mobile cell phone, Defendant objected to all testimony concerning text messages *sent to* Defendant on grounds of relevancy and hearsay. In a side bar outside of the hearing of the jury, the State explained that it planned to introduce nine pages of text messages sent by and to Defendant's T-Mobile cell phone dated from September 25, 2016, to the time the phone was deactivated September 26, 2016, and to have Detective Gish testify that almost all of the text messages had been deleted by the time of Defendant's arrest. The trial court then dismissed the jury from the courtroom. After extensive argument of counsel and testimony by Detective Gish, the trial court noted that the text messages occurred "within hours after what the State is saying is a double homicide." The court characterized some of the text messages as Defendant's reaction to text messages he received and other text messages as Defendant instructing other people what they needed to do. The court determined that many of the text messages sent to Defendant "put[] into context" text messages that were sent by Defendant. The court noted that "some of this stuff may not very well be relevant, but it's just contextual information that he's getting and his response to all of that." Finally, the court found that the text messages sent to Defendant were not "being offered for the truth." The court ruled that it would "allow this brief short period of snippet of text messages to be introduced."

With the jury back, Detective Gish testified that he extracted from Defendant's T-Mobile cell phone one text message received and one text message sent before the time of the shooting. The first text message was sent to Defendant by someone named "Axles" at 12:53:22 a.m. on September 25, 2016, and simply said, "??." A text message was sent to Axles at 1:25:16 a.m. stating, "Mom house." There were no text messages sent or received for approximately four hours after the text message was sent to Axles. Detective Gish stated that, beginning at approximately 5:35 a.m., twenty minutes after the shooting, "we

start seeing much more activity on the phone in terms of text messaging from and to" Defendant. Detective Gish said that he extracted 150 text messages that were sent or received between 5:35 a.m. on September 25 and 4:46 p.m. on September 26, 2016. All of the text messages were itemized chronologically in a nine-page document which was entered as Exhibit 17. Detective Gish said that all but the last eighteen of the text messages shown on Exhibit 17 had been deleted but that the deleted text messages had not been overwritten and were recovered.

Exhibit 17 shows that, at 5:35:51 a.m., a text message was sent to "Chanricka" stating, "Call me 911." Five text messages were sent from "Waynetta" over the next ten minutes. A text message was sent to "Jennifer" at 6:35:11 a.m. stating, "Call me," and a second text message was sent at 7:15:33 a.m. stating, "Call me now." Jennifer and Defendant exchanged text messages over the next two minutes. Thirteen text messages were sent to Defendant over the next seven hours, each essentially telling Defendant that the sender loved him or asking Defendant how he was doing. Defendant sent a text message to someone identified as "J-1" at 3:07:35 p.m. stating, "I'm cool," and a text message to "Cece" at 3:08:04 p.m. stating, "Luv you too."

Detective Gish testified that Defendant sent a text message to Waynetta at 3:43:07 p.m. on September 25 and a text message to Jennifer twenty seconds later, both stating, "Don't talk to nobody." Waynetta replied by a text message sent at 3:45:26 p.m., "I have been acting stupid I haven't said anything." Defendant sent another text message to Waynetta at 3:45:48 p.m., saying, "Tell mom the same thing." Someone referred to as "D Dog" sent a text message at 4:25:35 p.m. to Defendant saying, "Close ur facebook account" and a second text message at 4:25:37 p.m. saying, "Tell Gooch to stop talking." Defendant sent a text message to Gooch at 4:31:57 p.m. stating, "stop talking to (sic) much." A document listing these eight text messages was entered as Exhibit 18A.

Detective Gish identified a series of messages on September 25 beginning at 5:32:44 p.m. between Axles and Defendant. At 6:23:20 p.m., Axles wrote, "When u gonna be good," and Defendant responded at 6:23:33 p.m., "It over." These two text messages were included in a list of seven text messages entered as Exhibit 18B.

Jennifer sent a text message at 6:34:01 p.m., stating, "The news got ur picture," and a second text message at 6:34:20 p.m. stating, "They just released ur pic on the news." A text message from Cece at 9:41:23 p.m. stated, "They got you on camera." Another message from an unidentified person sent at 10:55:47 p.m. stated, "I just watched the news." Defendant responded twenty seconds later, "ok." A document listing these five text messages was entered as Exhibit 18C.

- 5 -

Finally, at 11:44 p.m. on September 25, Defendant sent a text message to "Nic," stating, "Between us that me (sic) delete please." This text message was entered as Exhibit 18D.

On cross-examination, Detective Gish agreed that he could not tell when the text messages were deleted, other than that they were deleted after the last timestamp, which according to Exhibit 17 was 4:46:49 p.m. on September 26, 2016. Detective Gish stated that, given the large amount of deleted information he recovered from Defendant's T-Mobile cell phone, he believed he "may have gotten it all."

Dr. Miguel Laboy, a Medical Examiner for Metro-Nashville, testified as an expert in forensic pathology that the cause of Mr. Morrow's death was loss of blood caused by a large caliber projectile that perforated a major artery. He said that the manner of death was homicide.

Dr. Thomas Deering, Deputy Chief Medical Examiner for Metro-Nashville, testified as an expert in forensic pathology that the cause of Mr. Jimale's death was multiple gunshot wounds, including one from a projectile that entered the right temple and exited the forehead. He said that a second projectile entered Mr. Jimale's thigh, a third entered his upper left leg, and a fourth entered his right forearm. Dr. Deering said that the manner of death was homicide.

Following deliberations, the jury convicted Defendant of all charged offenses. The trial court sentenced Defendant to life for each of the three murder convictions and ordered the two life sentences for premediated murder to run consecutively. The court merged the felony murder conviction and sentenced Defendant to twelve years on the weapons charge to run concurrently with the life sentences. Following the denial of the motion for new trial, Defendant timely filed a notice of appeal.

## Analysis

On appeal, Defendant claims that the trial court erred by allowing the admission of hearsay evidence, erred by allowing the admission of discoverable evidence that was not provided to Defendant, and erred by empaneling a jury which was not representative of Defendant's peers.

The State responds that the text messages were relevant and that the text messages sent to Defendant were not offered for the truth of the matter asserted. We agree with the State. The State argues that the other errors alleged by Defendant are waived and do not

merit plain error relief. We agree that Defendant is not entitled to plain error relief on the other claimed errors.

## Hearsay Evidence

Under the Tennessee Rules of Evidence, "hearsay" is any statement, other than one made by the declarant while testifying at trial or in a hearing, offered into evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801. Hearsay statements are not admissible unless they fall within one of the evidentiary exceptions or some other law renders them admissible. Tenn. R. Evid. 802. A trial court's decision of whether a particular statement is hearsay and whether a hearsay exception applies are questions of law that are reviewed *de novo*. *Kendrick v. State,* 454 S.W.3d 450, 479 (Tenn. 2015). A trial court's factual findings and credibility findings relative to a hearsay issue are binding upon an appellate court unless the evidence preponderates against them. *Id.*

In his appellate brief, Defendant fails to identify any specific text message sent to Defendant that he claims is hearsay but instead makes a general claim that all of the approximately eighty-five text messages sent to Defendant and listed in Exhibit 17 were hearsay. Defendant does not claim that the messages sent by Defendant were hearsay. Even a cursory review of the text messages sent to Defendant shows that the vast majority of the text messages are clearly not offered for the truth of the matter asserted. Illustrative examples of such text messages sent to Defendant include: "call me," "you ok," "what's up," "love you," "you good," "U cool," and "where you at?" Because Defendant has failed to identify which text messages he claims are hearsay, we will limit our review to the eight text messages sent to Defendant that Detective Gish testified about before the jury. Because the trial court determined that these text messages sent to Defendant were not offered for the truth of the matter and thus were not hearsay, our review will be *de novo*.

The text messages about which Detective Gish testified:

| | | |
|---|---|---|
| 3:43:07 p.m. | To: Waynetta | Don't talk to nobody |
| 3:43:27 p.m. | To: Jennifer | Don't talk to nobody |
| 3:45:26 p.m. | From: Waynetta | I have been acting stupid I haven't said anything |
| 3:45:48 p.m. | To: Waynetta | Tell mom the same thing |
| 4:25:35 p.m. | From: D Dog | Close ur Facebook account |
| 4:25:37 p.m. | From: D Dog | Tell Gooch to stop talking |

- 7 -

| | | |
|---|---|---|
| 4:31:57 p.m. | To: Gooch | Stop talking to much |
| 6:23:20 p.m. | From: Axles | When u gonna be good |
| 6:23:33 p.m. | To: Axles | It over |
| 6:34:01 p.m. | From: Jennifer | The news got your picture |
| 6:34:20 p.m. | From: Jennifer | They just released your picture |
| 9:41:23 p.m. | From: Cece | They got you on camera |
| 10:55:47 p.m. | From: [Unknown] | I just watched the news |
| 10:56:02 p.m. | To: [Unknown] | Ok |
| 11:44:43 p.m. | To: Nic | Between us that me (sic) delete please." |

The message from Waynetta was not offered to prove that Waynetta had been acting stupid or that she had not said anything. This text message was in response to and was offered to provide context to Defendant's text message, "Don't talk to nobody." *See State v. Nicholas Brooks*, No. W2019-01802-CCA-R3-CD, 2020 WL 7252035, at *7 (Tenn. Crim. App. Dec. 9, 2020), *perm. app. denied* (Tenn. Apr. 8, 2021), *see also* Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.01 [10], 8-27 (6th ed. 2011) ("Statements designed to (1) provide a context for, or (2) permit an understanding of, another statement may not be hearsay."). We determine that the text messages from Waynetta were not hearsay and that the trial court properly admitted them as evidence.

The two text messages from D Dog, "Close ur Facebook account" and "Tell Gooch to stop talking," were orders or instructions to Defendant. "Orders or instructions are often not hearsay because they are not offered to prove the truth of their content." Neil P. Cohen et al., *Tennessee Law of Evidence*, § 801.9 at 500 (Michie ed., 3d ed.1995) (footnote omitted); *see State v. Derek T. Payne*, No. W2001-00532-CCA-R3-CD, 2002 WL 31624813 at *10 (Tenn. Crim. App., Nov. 20, 2002), *perm. app. denied* (Tenn. May 19, 2003); *State v. Oneal Sanford*, No. E1999-02089-CCA-R3-CD, 2001 WL 681312, *6 (Tenn. Crim. App., June 18, 2001), *perm. app. denied* (Tenn. Nov. 5, 2001); *State v. Reginald S. Mabone*, No. 02C01-9203-CR-00054, 1993 WL 270618, at *1 (Tenn. Crim. App., July 21, 1993), *perm. app. denied* (Tenn. Oct. 4, 1993). D Dog's instruction to Defendant to tell Gooch to stop talking was heeded by Defendant, who a few seconds later sent a text message to Gooch telling him to stop talking so much, and therefore, D Dog's text message also provided context to Defendant's text message. D Dog's text messages were not offered to prove the truth of the matter asserted and were not hearsay. The trial court properly admitted the text messages.

The text message from Axles, "When u gonna be good," was a question. Questions, like commands, are not generally considered hearsay because they are not offered for the truth of the matter asserted. *Oneal Sanford*, 2001 WL 681312, at *6 (quoting Neil P. Cohen et al., *Tennessee Law of Evidence*, § 801.9 at 500 (Michie ed., 3d ed.1995) (footnote omitted)). Defendant immediately responded to Axles's question by texting, "It over." Axles's question was not offered for the truth of the matter asserted and was not hearsay. Axles's question also provided context to Defendant's text message response. The trial court properly admitted the text messages.

The next four text messages to Defendant involved the television news. During trial, Detective Saxton testified that a still photograph obtained from the video, which showed Defendant's face, dreadlocks, and tattoo on his right arm, was provided to and used by local news stations beginning with the six o'clock p.m. news on September 25, 2016. The first two text messages from Jennifer, "The news got your picture" and "They just released your picture" were sent shortly after 6:30 p.m. These text messages were sent to notify Defendant that his identity had been made public. The text messages were not offered to prove that Defendant's picture was on the news. These text messages were not hearsay. Similarly, the text message from Cece, "They got you on camera," was sent to notify Defendant and was not offered for the truth of the matter asserted. The text message from the unidentified person, "I just watched the news," was not offered to prove the sender just watched the news and was therefore not hearsay. The trial court properly admitted the text messages.

As part of his hearsay argument, Defendant claims that the trial court also denied Defendant's "right to confront his accuser" because the text messages were testimonial evidence which "allowed the State to advance its argument before the jury without the fear of the writers of the messages being confronted at the trial" by Defendant. Defendant claims that admission of the text messages violated the Confrontation Clause of both the federal and state constitution. U.S. Const. amend. VI., Tenn. Const. art. I, § 9.

As the United States Supreme Court explained, when a court interprets the Sixth Amendment, it should keep in mind that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Crawford v. Washington*, 541 U.S. 36, 50 (2004). Continuing, the Court in *Crawford* stated:

> This focus also suggests that not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be

- 9 -

unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, ex parte examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them.

The text of the Confrontation Clause reflects this focus. It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 2 N. Webster, An American Dictionary of the English Language (1828)."

*Id.* at 51.

The Tennessee Supreme Court stated that a "statement is nontestimonial if the primary purpose is something other than establishing or proving past events potentially relevant to prosecution, such as providing or enabling assistance to resolve an ongoing emergency." *State v. Franklin*, 308 S.W.3d 799, 817 (Tenn. 2010). Here, the primary purpose for introducing the text messages sent to Defendant was to provide context to Defendant's text messages. Additionally, the text messages were not sent by individuals "acting in the role of a 'witness' at the time" the text messages were sent. *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011). We determine that the text messages sent to Defendant were not testimonial. There was, therefore, no Confrontation Clause violation.

Even assuming that some of the above eighty-five text messages sent to Defendant were hearsay and were improperly admitted, any error in admitting these text messages was harmless beyond a reasonable doubt given the overwhelming evidence that Defendant shot and killed the two victims. *King v. State*, 989 S.W.2d 319, 329-30 (Tenn. 1999); *State v. Hutchison*, 898 S.W.2d 161, 171 (Tenn. 1994). Although some of the text messages may not be relevant, these text messages did not further incriminate Defendant, and admitting them was harmless considering the overwhelming evidence of Defendant's guilt. *State v. Jonathan Ray Chapman*, No. E2013-00839-CCA-R3-CD, 2014 WL 1829817, at *3 (Tenn. Crim. App. May 5, 2014), *see* Tenn. R. App. P. 36(b).

### Disclosure of Discoverable Evidence

#### *Video*

Defendant claims that the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and violated Tennessee Rule of Criminal Procedure 16(a)((1)(F) by failing to provide him a copy of the video and that the trial court erred by

allowing the video to be played for the jury. Defendant lodged no contemporaneous objection when the video was referred to or introduced as an exhibit at trial. Defendant first raised this issue in his motion for new trial.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constitutes waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Because, Defendant raises a constitutional issue, we choose to address the issue for plain error.

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. Defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Tennessee Rule of Criminal Procedure 16 governs disclosure and inspection of certain evidence by the State. Rule 16(a)((1)(F) reads, as follows:

Documents and Objects. Upon a defendant's request, the [S]tate shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, if the item is within the [S]tate's possession, custody, or control and:

- 11 -

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial[.]

Defendant does not claim that the State failed to disclose the video, that defense counsel requested a copy of the video, that the State refused to provide a copy, or that the State refused to allow Defendant to copy the video. Defendant has failed to show that the State violated the disclosure requirements of *Brady* or Tennessee Rule of Criminal Procedure 16. Defendant has failed to show that a clear and unequivocal rule of law was breached, or that a substantial right of the accused was adversely affected, or that consideration of the issue is necessary to do substantial justice. *State v. Minor*, 546 S.W.3d 59, 67 (Tenn. 2018); *Adkisson*, 899 S.W.2d at 641-42. Defendant is not entitled to relief for plain error.

### *Fingerprints*

On appeal, Defendant claims that "it came to light in the midst of the [t]rial that fingerprints were lifted from the scene of the incident" and that, "even though the fingerprints were lifted, these were never evaluated for identification purposes or if these were, the results were not provided to the defense." During trial, officers testified, without objection from Defendant, that fingerprints were lifted near the exit door, from some bottles and cups, and from some dollar bills but that none of the prints matched to Defendant. Defense counsel then cross-examined the witnesses about the fingerprints to reemphasize that there were no fingerprints of Defendant found.

Defendant failed to make a contemporaneous evidentiary objection to bring the issue to the trial court's attention, so we will not consider the issue under plenary review. *State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020). Moreover, Defendant is not entitled to plain error relief because Defendant has failed to show that he did not waive the issue for tactical reasons or that consideration of the issue is necessary to do substantial justice. *Minor*, 546 S.W.3d at 67; *Adkisson*, 899 S.W.2d at 641-42.

### **Trial Jury**

Every criminal defendant has a constitutional right to a trial by an impartial jury of his peers. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *see also State v. Sexton*, 368 S.W.3d 371, 390 (Tenn. 2012). "To establish a prima facia case," a defendant who

challenges "the composition of a jury on the grounds it did not reflect a fair cross-section of the community," must show: "1) that the allegedly excluded group is a distinctive group in the community; 2) that its representation on the venire is not fair and reasonable in relation to its numbers in the community; and 3) that the under representation resulted from systematic exclusion." *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989) (citing *Duren v. Mississippi*, 439 U.S. 357, 364 (1979)).

Defendant challenged the composition of the jury in his motion for new trial, claiming that Black people comprised 27.88% of Nashville's population and that there were only two Black people empaneled, thereby making up only 16.66% of the jury. During argument on the motion for new trial, Defendant conceded there were in fact three Black people empaneled and that twenty-five percent of the jury was Black. Defendant does not claim that he objected to the makeup of the jury during jury selection, so this court will only review for plain error . *See State v. Edward Shawndale Robinson*, No. M2011-02000-CCA-R3-CD, 2013 WL 1799971, at *4 (Tenn. Crim. App. Apr. 29, 2013) (*no perm. app. filed*).

The record does not include a transcript of the jury selection. The record is insufficient to clearly establish what occurred during the selection of the jury, to show that some clear and unequivocal rule of law was breached, or to show a substantive right of Defendant was adversely affected. *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016); *Adkisson*, 899 S.W.2d at 641-42. Defendant is not entitled to plain error relief on this issue.

## Cumulative Error

Defendant made a cumulative error argument in the conclusion to his brief. Having found no error committed by the trial court, there can be no cumulative error. *State v. Colvett*, 481 S.W.3d 172, 209 (Tenn. Crim. App. 2014).

## Conclusion

The judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 13 -